UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DANIELLE RENEE HALEY,

    Plaintiff,

    v.

                         Case No. 3:25-CV-797-GSL-SJF

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

## OPINION AND ORDER

This matter is before the Court on Plaintiff Danielle Haley's appeal of the Social Security Administration's decision dated August 27, 2024, which found that Haley was neither disabled nor entitled to disability benefits. The parties have fully briefed the appeal. [DE 14; DE 18–19]. Finding that none of Plaintiff's arguments merit a remand, the ALJ's decision is **AFFIRMED**.

## BACKGROUND

### I.    Procedural History

This case involves a lengthy history of proceedings which are summarized as follows. On April 19, 2017, Plaintiff applied for disability insurance benefits under Title II of the Social Security Act (42 U.S.C. §§ 401–33), alleging disability beginning on June 1, 2016. [DE 13 at 194, 811]. Plaintiff's application was denied both initially and on reconsideration. [*Id.* at 111, 124]. Following a hearing on February 12, 2019, an Administrative Law Judge (ALJ) issued an unfavorable decision on April 2, 2019. [*Id.* at 16–26, 36–99]. The Appeals Council denied Plaintiff's request for review on January 27, 2020, and Plaintiff thereafter filed a civil action with the Northern District of Indiana. [*Id.* at 956–66]. On August 4, 2021, the court remanded the

matter to the agency for further proceedings, [*see id.* at 878–931], and on September 22, 2022, the ALJ once more issued an unfavorable decision, [*id.* at 967–79, 980–84, 988–1000]. The Appeals Council reviewed the decision and remanded the matter to a separate ALJ on January 25, 2024. [*Id.* at 1006–11].

Following a third administrative hearing, [*see id.* at 840–76], the new ALJ issued an unfavorable decision on August 27, 2024, again finding Plaintiff was not disabled. [*Id.* at 808–28]. The Appeals Council declined to assume jurisdiction over the matter on July 17, 2025, [*id.* at 802–07], and Plaintiff's appeal soon followed on September 1, 2025. [DE 1]. This Court has jurisdiction under 42 U.S.C. § 405(g).

## II.    The ALJ's Decision

Following the standard five-step sequential evaluation process established under 20 C.F.R. §§ 404.1520(a), [*see* DE 13 at 812–13] the ALJ first found at step one that Plaintiff had not engaged in any substantial gainful activity during the relevant period from June 1, 2016, through her date last insured, [*id.* at 814]. At step two, the ALJ found Plaintiff possessed the following severe impairments: Ehlers-Danlos Syndrome (EDS); fibromyalgia; obesity; Postural Orthostatic Tachycardia Syndrome (POTS); hypertension; cervical radiculopathy; asthma; history of right hip labral tear; degenerative disc disease of the lumbar spine; history of bilateral carpal tunnel syndrome; and history of right knee ganglion cyst with bone edema and patellar cartilage fissuring.[1] [*Id.*].

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the

---

[11] Additional non-severe impairments were also noted, including: diabetes, obstructive sleep apnea, hypothyroidism, PCOS, migraines, history of Lyme disease, history of ADHD, anxiety, and depression. [DE 13 at 814]. These additional conditions were considered when accounting for Plaintiff's overall residual functional capacity. [*Id.*].

regulations. [*Id.* at 817–19]. The ALJ then determined that, based on the entire record, Plaintiff had the residual functional capacity (RFC) to perform sedentary work with the following limitations:

- Plaintiff must have the option to alternate between the sitting and standing positions every thirty minutes for up to five minutes at a time while remaining on task;
- No climbing ladders, ropes, or scaffolds;
- No kneeling or crawling;
- No balancing as defined in the Selected Characteristics of Occupations;
- Occasional stooping, crouching, and climbing ramps and stairs;
- No overhead reaching with the bilateral upper extremities but frequent reaching in all other directions;
- Frequently handle and finger with the bilateral upper extremities;
- Plaintiff must avoid dangerous moving machinery and unprotected heights, as well as concentrated exposure to pulmonary irritants;
- Plaintiff may not operate a motor vehicle as part of her job duties;
- Plaintiff must avoid concentrated exposure to temperature extremes; and
- Plaintiff must work in a moderate or reduced noise environment as defined in the Selected Characteristics of Occupations.

[*Id.* at 819].

At step four the ALJ found that Plaintiff was unable to perform her past relevant work. [*Id.* at 827]. Finally, at step five, the ALJ determined that based on Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that the claimant could have performed through the date last insured. [*Id.*]. Based on testimony from the vocational expert, the following jobs existed: charge account clerk (34,000 jobs), circuit board tester (117,000 jobs), and costume jewelry maker (25,000 jobs). [*Id.* at 828]. Therefore, the ALJ concluded that Plaintiff was not disabled. [*Id.*].

## LEGAL STANDARDS

### I.      Standard of Review

Because the Appeals Council denied review, the Court evaluates the ALJ's decision as the final word of the Commissioner. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). This Court will affirm the Commissioner's findings of fact and denial of benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "The threshold for substantial evidence 'is not high.'" *Warnell v. O'Malley*, 97 F.4th 1050, 1052 (7th Cir. 2024) (quoting *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019)). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision so long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

The ALJ has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In evaluating the ALJ's decision, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nonetheless, the Court must conduct a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the claimant and the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his or her findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir.

4

2001). Essentially, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

## II.      Standard for Disability

Disability benefits are available only to those individuals who can establish disability under the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). To qualify as "disabled" under the Act, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" is defined as work-related activity involving significant physical or mental activities done for pay or profit. 20 C.F.R. § 404.1572.

These Social Security regulations create a five-step process to determine whether the claimant qualifies as disabled under the Act. 20 C.F.R. §§ 404.1520(a)(4)(i)–(v); 416.920(i)–(v). The steps anchoring the ALJ's analysis are as follows: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a medically severe impairment; (3) whether the claimant's impairment meets or equals one listed in the regulations; (4) whether the claimant can still perform past relevant work; and (5) whether the claimant can perform any other work in the national economy. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

At step two, an impairment is deemed severe if it significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. §§ 404.1522(a); 416.922(a). At step three, a claimant is "disabled" if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations. 20 C.F.R. §§

404.1520(a)(4)(iii); 416.920(a)(4)(iii). If not, the ALJ must then evaluate the claimant's residual

functional capacity (RFC), which is defined as the most a person can do despite any physical and

mental limitations that may affect what can be done in a work setting. 20 C.F.R. §§ 404.1545;

416.945. The ALJ uses the RFC to determine whether the claimant can perform his or her past

work under step four and whether the claimant can perform other work in society under step five.

20 C.F.R. §§ 404.1520(e); 416.920(e). Where the claimant cannot perform such work, the

claimant is "disabled." The claimant carries the initial burden of proof at steps one through four,

while the burden shifts to the Commissioner under step five to show that there are a significant

number of jobs in the national economy that the claimant can perform. *Young v. Barnhart*, 362

F.3d 995, 1000 (7th Cir. 2004).

## DISCUSSION

Plaintiff raises three grounds for remand: first, that the ALJ's RFC finding is not

supported by the record and lacks an accurate and logical bridge; second, that the ALJ erred in

rejecting Plaintiff's statements; and third, that the ALJ's step-five finding is not supported by

substantial evidence. [DE 14 at 9–10]. The Court will address each of Plaintiff's arguments

below.

### I.      The ALJ's Limitations Findings Contained a Logical and Accurate Bridge and Were Supported by Substantial Evidence in the Record.

Generally, Plaintiff argues the ALJ's decision selectively cherry-picks evidence and fails

to draw an accurate and logical bridge to support her conclusions, warranting remand. [DE 14 at

10]. More specifically, she attacks the ALJ's findings regarding her severe impairments and the

several limitations imposed when calculating the RFC. [*Id.*].

As a reminder, the ALJ found that Plaintiff's severe impairments include EDS,

fibromyalgia, obesity, POTS, hypertension, cervical radiculopathy, asthma, a history of a labral

tear in the hip, degenerative disc disease of the lumbar spine, a history of carpal tunnel syndrome, and a history of right knee injury. [DE 13 at 814]. The ALJ also found non-severe impairments, including diabetes, obstructive sleep apnea hypothyroidism, PCOS, migraines, history of Lyme disease, history of ADHD, anxiety, and depression. [*Id.*]. Based on the totality of these impairments, the ALJ determined Plaintiff's RFC and concluded the following limitations were warranted:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant must have the option to alternate between the sitting and standing positions every 30 minutes for up to 5 minutes at a time while remaining on task; no climbing ladders, ropes, or scaffolds; no kneeling or crawling; no balancing as defined in the Selected Characteristics of Occupations; occasional stooping, crouching, and climbing ramps and stairs; no overhead reaching with the bilateral upper extremities; frequent reaching in all other directions; frequently handle and finger with the bilateral upper extremities; avoid dangerous moving machinery and unprotected heights; avoid concentrated exposure to pulmonary irritants; no operating a motor vehicle as part of her job duties; avoid concentrated exposure to temperature extremes; and work in a moderate or less noise environment as defined in the Selected Characteristics of Occupations.

[*Id.* at 819]. Furthermore, the ALJ noted immediately after that the vocational expert's findings and jobs cited under step five would not be precluded from these limitations even if additionally limited to simple instructions, no assembly line type work, no strict hourly quotas, or occasional changes to a work routine were imposed. [*Id.* at n.1]. Despite these findings, Plaintiff asserts the ALJ failed to properly accommodate all of Plaintiff's severe impairments, particularly regarding her EDS and POTS. [DE 14 at 11–12]. The Court will address those arguments accordingly.

### A. Postural Alteration Limitation

Plaintiff first argues there is no logical bridge as to the ALJ's postural alteration limitation, arguing her testimony and the record support the contrary conclusion that her POTS symptoms are triggered by changes in position. [*Id.* at 12 (citing DE 13 at 339–41, 434, 851)].

The ALJ noted that during the 2024 administrative hearing, Plaintiff "asserted that even minimal position changes cause her to get dizzy or faint due to her condition of POTS, that she alleged "significant limitation, including with changing positions due to POTS as well as severe pain and recurrent subluxation due to [EDS]," and that she "stated she needs to lay down from 30 minutes to one hour after a shower due to a flare up of her POTS." [DE 13 at 820]. The ALJ found that "[e]ven if this is the case currently, her date last insured expired on December 31, 2021 in this Title II only case, and such assertions are not supported by the overall record and do not require limits in the [RFC] through the date last insured." [*Id.*].

Nonetheless, upon reviewing Plaintiff's medical history, the ALJ found a postural limitation was warranted. [*Id.* at 821]. Specifically, the ALJ imposed postural and hazard limits in the RFC as well as a sit/stand *option* after Plaintiff consulted an orthopedic doctor about hip complaints in 2017. [*Id.*]. At that time, Plaintiff's EDS was known, but her POTS was only suspected; her doctor's notes indicated intermittent syncopal episodes only and did not further indicate that she was getting dizzy or having syncopal episodes while changing positions at the doctor's office. [*Id.*]. The ALJ also explained the following in addressing Plaintiff's claims of dizziness following positional changes:

> Addressing some of the claimant's more extensive alleged limits further, for instance, the claimant's allegations that even minimal position changes cause her to get dizzy or faint due to POTS or that she experiences pain/subluxations with all movements due to EDS, this is not reflected in the record. Although there is some intermittent syncope noted in the record (Exhibits 5F, 11F, 12F), it is adequately accommodated by limiting the claimant to sedentary work with postural and hazard limits as well as including a sit/stand option and no driving as part of her job duties in the [RFC]. Furthermore, as one example, these allegations are very much inconsistent with the record documenting the level and intensity of exercise the claimant does on a regular basis through the date last insured.
>
> For instance, she reported doing a great deal of weight training in 2017 or 2018 with some neck pain (Exhibit 16F/7). She was doing water therapy, but found it did not get her heart rate up enough (Exhibit 11F/11). She was exercising almost daily

in January 2018, including doing Zumba cardio dance exercise a few times per week, sometimes up to 6 times per a week (Exhibit 13F/20, 38, 40, 42). She exercised every day, which included a weight-training class involving lifting ten to fifteen pounds for forty-five minutes to one hour (4E/6, 13F/40). In May 2018, she was complaining of left hip pain after doing a lot of "body bump" exercises that she indicated involved a lot of aggressive squats and lunges (Exhibit 13F/80). In December 2018, she had neck pain, but this was after a child was standing on her shoulders and fell on her neck (Exhibit 11F/3). She was not regularly exercising in 2020, but some of this was due to the gym being closed during Covid (Exhibit 19F/86, 95). In October 2021, she was dancing in a production of Rent and working on dance routine (Exhibit 19F/43). The weight training also seems inconsistent with her allegations of a significantly reduced ability to use her hands. She testified she exercised to keep her ligaments loose and muscles strong, but there is [a] clear inconsistency between her activity level and allegations that minimal movement and position changes resulted in debilitating POTS symptoms, including significant dizziness, fainting, or an increase in symptoms due to heat.

[*Id.* at 823–24].

Here, the Court finds that the ALJ has sufficiently and thoroughly explained their analysis in concluding that a postural alteration limitation was warranted. Although Plaintiff complains that the ALJ's decision is contradictory to her claimed symptoms, this argument falls short for a few reasons. First, the ALJ is not required to prepare a thorough dissertation or explain in immense detail their findings and reasoning to form a logical bridge. This is because "the 'logical bridge' language in our caselaw is descriptive but does not alter the applicable substantial evidence standard." [DE 18 at 5]. *See Brumbaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021) (citing *Biestek*, 587 U.S. at 99). Rather, the substantial evidence standard is met through the "most minimal" level of articulation, a "shorthand" requiring only that ALJs "provide an explanation for how the evidence leads to their conclusions" so that a reviewing court can "assess the validity of the agency's ultimate findings and afford [the plaintiff] meaningful judicial review." [DE 18 at 6]. *See Warnell*, 97 F.4th at 1053–54. As long as the ALJ sufficiently explains the decision to allow for meaningful judicial review, then the ALJ need not

"fully summarize the record, or cite support for every proposition or chain of reasoning." *Id.* at 1053.

As the above-quoted passages demonstrate though, the ALJ has gone above and beyond minimum articulation and has explained at length Plaintiff's complaints, the relevant medical evidence, and the evidence supporting their findings. Further, the ALJ has addressed the inconsistencies through numerous citations to the record supporting their findings. Although Plaintiff argues that her testimony and the record support otherwise, her citations either recite what the ALJ already found, fail to note anything contrary to the ALJ's findings, or fail to note anything at all. [*See* DE 13 at 339–41 (noting 2017 syncope symptoms occur while standing and upon standing, are present for seconds, or occur in intermittent episodes), 434 (does not address EDS or POTS symptoms), 851 (beginning to testify about dizziness but, after addressing the ALJ, fails to return to the topic)]. Put simply, Plaintiff's arguments and evidence in support fail to compel a contrary finding or greater functional limitations than those found by the ALJ. *See Thorlton v. King*, 127 F.4th 1078, 1081 (7th Cir. 2025) (quoting *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021)) ("Put most simply, we will reverse an ALJ's decision only if the record 'compels a contrary result.'").

In addition, another reason Plaintiff's complaints fall short is that the ALJ does not impose a strict requirement that Plaintiff change positions, but rather provides the *option* to do so as necessary to alleviate pain. This appears consistent with the medical record evidence noting intermittent syncopal episodes lasting seconds. Should Plaintiff find that altering positions fails to alleviate her POTS symptoms, or worse aggravates them, then she is not required to do so, nor would not doing so negatively impact her ability to perform any of the jobs identified by the

vocational expert. [*See id.* at 819, 873]. Accordingly, the ALJ provides an accurate and logical bridge to their conclusion and their findings are supported by substantial evidence.

### B.  Postural Restrictions and Obesity

Next, Plaintiff argues there is no accurate or logical bridge supporting the ALJ's restriction to occasional stooping, crouching, and climbing of ramps or stairs. [DE 14 at 12]. Plaintiff states her obesity deserved careful consideration given her fatigue and mental impairments, but argues that "here, the language of the RFC shows that careful consideration was not given." [*Id.* at 13]. Yet Plaintiff's three-sentence assertion in support does not identify *how* the ALJ's decision lacked careful consideration, nor does it provide *any* citations to the record leading to a contrary result. The remainder of Plaintiff's argument consists of three citations, one to a case from the Northern District of Indiana, *see Adams v. Berryhill*, 2019 WL 2591016, at *3–4 (N.D. Ind. June 24, 2019), and two to Social Security Policy Interpretation 02-01p. None of these citations though are tied back to the findings in this case.

As to *Adams*, the court found a remand was warranted there because the ALJ concluded that the claimant was capable of walking or standing for two hours and could occasionally stoop, kneel, crouch, or crawl, all of which was despite the claimant's severe obesity, degenerative disc disease, and other ailments. *Adams*, 2019 WL 2591016, at *3. The court also found the ALJ's decision was questionable given the heavy reliance on RFC assessments by state agency consultants who never examined the claimant and whose testimony was, by that point, obsolete. *Id.* at *4. But Plaintiff never discusses the comparisons of this case to *Adams*, and as will be discussed with regard to the ALJ's findings here, these facts are distinguishable. Likewise, as to the policy interpretation, which notes that "[i]n cases involving obesity, fatigue may affect the

person's physical and mental ability to sustain work activity," *see* 2002 WL 3468621, at *6,[2]

Plaintiff does not indicate how the ALJ's decision failed to account for any fatigue or mental

limitations that may be caused or exacerbated by her obesity.

Overall, Plaintiff's argument is sparse and underdeveloped.[3] Nonetheless, even

considering the argument on the merits, the Court is convinced the ALJ's decision contains a

logical bridge and is supported by substantial evidence in the record. In addressing Plaintiff's

obesity and movement, the ALJ explained:

> In December 2016, during a second opinion consultation, she was noted as obese with diffuse joint hypermobility. She was also diffusely tender, but not exquisitely so. Her reflexes were hyperreflexic diffusely, especially at the patellae. These were considered in the less than sedentary [RFC]. Nevertheless, her sensation was within normal limits. There was no focal atrophy, involuntarily movements or clonus. She had no gait abnormality like a Trendelenburg gait or steppage gait. She was diagnosed with EDS, hypermobility (Exhibit 3F/7-9).
>
> Shortly after filing her disability claim, in 2017, she saw an orthopedic doctor on consult due to her hip pain complaints (Exhibit 5F/5). On examination, her gait, sensation, strength and range of motion were normal. There was no swelling or tenderness of the hip, but she did have some positive hip impingement, a positive Faber's testing and positive Log roll testing. The undersigned did include postural and hazard limits in the [RFC] . . . . Her straight leg raising was negative and she had no tenderness, pain or swelling of the lumbar spine (Exhibit 5F/6).

[DE 13 at 821]. The ALJ further noted that in October 2017, following reports of intermittent

vertigo, Plaintiff "did have tenderness over her spine, but no notes of issues with strength,

sensation or her gait/ambulation (Exhibit 12F/20), and that these intermittent vertigo and

---

[2] The 2002 version of SSR 02-01p also explains that "[t]he effects of obesity may be subtle, such as the loss of mental clarity and slowed reactions." *See* 2002 WL 346821, at *3. That version, which Plaintiff relies on in her brief, has since been rescinded. *See* SSR 02-01p, 2019 WL 2374244. But because Plaintiff's disability claim preceded the current version, the Court relies on the prior interpretation in addressing Plaintiff's obesity argument.

[3] While some cases may deem this argument waived for underdevelopment, *see Poff v. Saul*, 2021 WL 2821169, at *4 (N.D. Ind. July 7, 2021) (citing *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1992)) (finding claimant's two-sentence argument that the ALJ failed to account for claimant's difficulty sleeping in formulating the RFC waived for underdevelopment); *see also United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim."), the Court sees just enough substance here to proceed with the merits.

syncopal episodes were accounted for in Plaintiff's RFC with reduced postural, hazard, and environmental limits." [*Id.* at 822]. Likewise, following a cervical spine x-ray in 2020 where mild degenerative changes were observed, along with complaints of neck pain and upper extremity numbness and tingling, these too were accounted for in the RFC. [*Id.*]. In December 2020, a primary care provider observed on physical examination some decreased sensation to Plaintiff's extremities and morbid obesity but that all other components of the physical examination were normal. [*Id.*]. These abnormalities were similarly accounted for in Plaintiff's RFC. [*Id.*]. Finally, in 2021, despite complaints of foot and ankle pain, Plaintiff's legs, sensation, and gait remained intact and normal. [*Id.*].

Moreover, in addressing Plaintiff's fatigue, the ALJ explained that while the record shows a history of fatigue, which was documented as having improved with CPAP treatment, her fatigue was also noticeably reduced with a more restful sleep. [*Id.* at 823]. Plaintiff testified that without CPAP, she had severe or excessive daytime fatigue, that in late 2018 she was doing fine, and that she acknowledged that she was not disciplined about going to bed early. [*Id.*]. Rather, Plaintiff explained that she would at times opt instead to stay up knitting or watching Netflix, thereby inducing or worsening her fatigue the next day. [*Id.*]. The ALJ accounted for Plaintiff's fatigue in the RFC, but found that no further limits were warranted. [*Id.*].

Thus, following the ALJ's findings and explanation, the Court is able to track the reasoning that resulted in Plaintiff's postural limitation. Despite Plaintiff's apparent claims to the contrary, the ALJ was not required to follow "a particular formula or incant magic words" in their analysis. *Garland v. Dai*, 593 U.S. 357, 369 (2021) (citation and quotation marks omitted). Rather, the ALJ was simply required to explain what evidence they found persuasive and unpersuasive, and explain why in light of the entire record. *See Deborah M. Saul*, 994 F.3d at

13

788. Here, the explanation is well-cited and the record shows that while Plaintiff reported hip and back pain, the presence of EDS and POTS symptoms, and obesity with some anxiety or depression, Plaintiff's gait, cognitive awareness, sensation, strength, and range of motion were generally normal on examination. [*See, e.g.*, *id.* at 342–43 (2017 complaints of hip pain, with recognition of obesity but no signs of numbness, pain, or swelling, and normal gait); 454 (same on follow-up); 501–04 (psychological evaluation acknowledging obesity and complaints of depression, anxiety, and ADHD, with finding of attentiveness, sufficient memory, and generally cognitive capability); 648–49 (complaints of gradually worsening back pain and fatigue, with noted obesity and anxiety, normal reflexes, and relation of obesity to depression); 1555–57 (2021 examination showing normal gait, normal neurological function, and alert orientation)].

Finally, as stated before, Plaintiff does not identify any treatment records showing that the ALJ's RFC calculation was deficient, nor does she indicate how the ALJ failed to account for her obesity. *See Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) (citing 20 C.F.R. § 416.912(c)) (emphasizing that "the primary responsibility for producing medical evidence demonstrating the severity of impairments remains with the claimant"); *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citing 20 C.F.R. § 404.1512(c); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)) ("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability.").

Accordingly, the Court finds the ALJ's explanation contained a logical bridge and that the decision was supported by substantial evidence.

### C. Handling Restrictions

Plaintiff also argues that the limitation for frequent reaching, handling, and fingering was inadequately supported. [DE 14 at 13]. Plaintiff bases this argument on two grounds. First, she

argues there is evidence in the record indicating numbness and tingling in her hands, as well as joint hypermobility, both of which she asserts contradicts the ALJ's finding that she could frequently handle or finger. [*Id.* (citing DE 13 at 52–57, 61–62, 673)]. Second, she argues that the vocational expert's testimony established that a limitation to *occasional* handling and fingering would eliminate the ability to perform any types of sedentary, unskilled work. [*Id.* (citing DE 13 at 875)].

But the ALJ considered these symptoms in their analysis, repeatedly noting reports of numbness, tingling, and joint hypermobility, as well as Plaintiff's subjective concerns. [*See* DE 13 at 816, 820–21, 822, 823, 826]. For example, the ALJ explained that Plaintiff alleged disability based on several physical symptoms, including "widespread joint pain, . . . hip and finger joint dislocations, . . . upper extremity numbness/tingling, and hypermobility, which she said limits her standing, walking, sitting, lifting, bending, reaching, kneeling, and climbing abilities (e.g., Exhibits 3E; 4E/5, 6; 9F/1; Hearing Testimony)." [*Id.* at 820]. The ALJ further noted Plaintiff's hearing testimony that she "uses finger/knuckle braces daily to prevent her fingers from subluxing, and that limits her mobility and prevents her from using her hands repetitively." [*Id.*]. The ALJ also acknowledged where Plaintiff's complaints were consistent with the record, such as in 2020 when a cervical x-ray documented mild denigrative changes consistent with Plaintiff's statements of upper extremity numbness and tingling, and later in December 2020 when Plaintiff's physical examination showed some decreased sensation to light touch and a 4/5 grip strength. [*Id.* at 822]. Despite this, the ALJ explained that Plaintiff's statements regarding intensity, persistence, and limiting effects were not wholly consistent with the record. [*Id.* at 820].

A consultation in December 2016 revealed that despite Plaintiff's hypermobility, her sensation was normal and there was no focal atrophy or involuntary movements. [*Id.* at 821]. In March 2019, Plaintiff reported that she was still exercising and feeling well despite some pain. [*Id.* at 822]. In October 2021, Plaintiff's EDS was reported as stable and a physical examination revealed no other significant findings. [*Id.* at 822–23]. Plaintiff also reported performing a great deal of weight training in 2017 and 2018 on an almost daily basis, testifying that she exercised to "keep her ligaments loose and muscles strong," and moreover, engaged in other projects such as hand knitting. [*Id.* at 766, 824, 1308]. Further, the ALJ considered on examination where Plaintiff was noted has having full or nearly full grip strength, test results that were only possibly indicative of "very minimal" carpal tunnel, and that Plaintiff's use of carpal tunnel splints or hand braces was neither long term, consistent, or mentioned at length in her medical reports. [*Id.* at 476, 822, 824, 1593, 1603, 1635].

And finally, regarding the vocational expert's testimony, it is true the vocational expert stated that *occasional* handling or fingering would result in no full-time, competitive employment. [*Id.* at 875]. Had the ALJ imposed such a limitation, then Plaintiff's argument would carry muster as she indeed would have likely been deemed disabled. But here, the ALJ imposed a limitation for *frequent* handling or fingering with the bilateral upper extremities. [*Id.* at 819]. For the reasons explained above, the ALJ found that additional limitations were unwarranted and that Plaintiff could generally use her hands. Thus, the vocational expert's answer to the ALJ's alternative hypothetical does not indicate an error on the ALJ's behalf.

Based on all of this, the Court finds that the ALJ's decision contained a logical bridge and is supported by substantial evidence.

**D. GI Issues**

Plaintiff next argues that the ALJ's determination that Plaintiff would not require additional bathroom breaks was improper. [DE 14 at 13]. Plaintiff states that the ALJ cited one treatment note indicating that during the relevant period, her fecal urgency and abdominal pain "resolved" through the use of medication, but asserts this "resolution" occurred in December 2017 and was temporary. [*Id.* (citing DE 13 at 648 (noting improvement of Plaintiff's abdominal pain and irritable bowel symptoms while on Bentyl))]. Plaintiff argues that by her consultation on August 18, 2020, her doctor's notes show the return of burning pain in her abdomen, bloody stool, and alternating bouts of diarrhea and constipation, all of which had reportedly worsened over the previous prior months. [DE 14 at 14 (citing DE 13 at 1619–20)]. Further, Plaintiff highlights that in October 2021, her doctor again observed worsening diarrhea and abdominal pain, with ten to twelve reported diarrheal episodes reported per day. [*Id.* (citing DE 1579–80)]. Accordingly, she argues a remand is warranted to address the ALJ's failure to determine the frequency and duration of any required bathroom breaks. [*Id.*].

In addressing Plaintiff's irritable bowels, the ALJ noted Plaintiff's testimony during the August 2024 hearing that she was frequently using the restroom and would avoid going to public places because of accidents. [DE 13 at 823]. The ALJ found though that during the relevant period prior to her date last insured in December 2021, Plaintiff reported that her symptoms were "much better" and had "resolved" while on Bentyl, and further, that she was "very happy" with the results. [DE 13 at 648, 823]. The ALJ also addressed Plaintiff's reports of increased abdominal pain with alternating constipation and diarrhea in August 2020, but highlighted that Plaintiff's complaints ceased two months afterward, that her abdominal and pelvic imaging studies were normal, and that it appeared her medication was once again effective. [*Id.* at 823,

1610–12, 1619–20]. Moreover, in addressing Plaintiff's October 2021 complaints that she had experienced a ten-day period of abdominal pain and diarrhea, the ALJ explained that Plaintiff reported intermittent issues and that she had not followed-up with a GI referral. [*Id.* at 822–23, 1567]. Plaintiff's medical notes also revealed that prior examinations, including an abdominal ultrasound, CT scan of the abdomen pelvis, and colonoscopy, were unremarkable. [*Id.* at 1567].

Based on the ALJ's findings and Plaintiff's argument, the Court is unconvinced that Plaintiff has demonstrated medical evidence compelling greater limitations than those found. *See Thorlton*, 127 F.4th at 1081. Therefore, the ALJ's determination that additional restroom breaks were not warranted contains a logical bridge and is supported by substantial evidence in the record.

### E. Absence from Work or Being Off Task

Finally, Plaintiff asserts the ALJ erred in not addressing whether Plaintiff would be absent from work or off task despite what she claims is ample evidence that such restrictions were necessary. [DE 14 at 14]. Particularly, Plaintiff highlights evidence concerning her syncope [*see* DE 13 at 61–73, 339–41, 401, 503], joint hypermobility [*see id.* at 52–53], pain [*see id.* at 97–98], fatigue [*see id.* at 207, 390–91, 421, 648, 781], and incontinence. But as discussed previously with regard to Plaintiff's other arguments, the ALJ considered each of these impairments at length when calculating Plaintiff's RFC and determining which limitations were necessary. Notably, none of the medical records support the necessity of an additional limitation for breaks or absences.

As for other evidence in the record addressing Plaintiff's ability to remain on task, the vocational expert testified during the August 2024 hearing that Plaintiff would be limited to approximately fifteen percent off-task time and ten to twelve unscheduled absences per year to

maintain full-time and competitive employment. [*Id.* at 875–76]. But while Plaintiff claims this would be impossible and that she struggles to remain on task, [*see id.* at 1061], Plaintiff's psychological records and medical notes suggest otherwise. As the ALJ explained, Plaintiff's psychological records note her anxiety and ADHD, as well as some fatigue, but otherwise note that Plaintiff is attentive, alert, and possesses a sufficient memory. [*See id.* at 501–04, 824, 1555–57]. The ALJ also stated the following as to Plaintiff's concentration, persistence, and maintenance:

> In this area, the claimant had mild limitation. The claimant's husband stated that most days the claimant can engage in her hobbies and interests, which include reading, singing, watching TV, crocheting, playing games, and doing art (Exhibit 5E). He also reported that the claimant follows written instructions very well and spoken instructions pretty well (Exhibit 5E/6). She is able to "roll with the punches gracefully," according to her husband when addressing her ability to handle changes in routine. She has trouble with handling stress, but he also noted in the right circumstance, it can be a motivator (Exhibit 5E/7). In October 2020, she reported some significant inattention during the day and anxiety. However, she was off Adderall for a couple years due to her pregnancy. She stated she was having anxiety especially trying to juggle being a full-time mother with kids who were doing virtual learning and one that had special needs (Exhibit 19F/87).

[*Id.* at 825]. And as to adaptation and self-management, the ALJ explained that Plaintiff had no limitation despite some reported issues with activities of daily living, was reporting improvement in her executive functioning with Adderall, and was exercising. [*Id.*]. Finally, the ALJ examined Plaintiff's mental impairments in depth, including her depression, anxiety, and ADHD, and determined these impairments were non-severe. [*See id.* at 816–17]. Based on this, the Court cannot find that the ALJ's decision lacked a logical bridge or was unsupported by substantial evidence.

Lastly, although Plaintiff asserts this case is akin to *Lanigan v. Berryhill*, 865 F.3d 558 (7th Cir. 2017), the Court finds those facts distinguishable. In *Lanigan*, a claimant previously employed as a general laborer filed for disability having after been diagnosed with diabetes and

treated for subsequently developed mental health issues. *Id.* at 560. As part of the claimant's

psychological treatment, his regular psychologist noted the claimant's mental impairments could

cause moderate limitations in his ability to understand, remember, or carry out detailed

instructions; remain concentrated for extended periods; maintain regular attendance or

punctuality; or work with others without distraction. *Id.* During the disability hearing, the ALJ

posed a hypothetical limitation to the vocational expert that the claimant could remain off task

for up to 10% of the workday in addition to regularly scheduled breaks. *Id.* at 561–62. The 10%

figure, however, was never explained. *Id.* at 562. The vocational expert testified that a person

could remain working if off task 10% of the workday, but those who will be off task *more* than

10% of the time would be incapable of maintaining competitive employment and would be

disabled. *Id.*.

On appeal, the Seventh Circuit found the ALJ's decision was not supported by substantial

evidence and that the 10% figure posed to the vocational expert was misleading. *Id.* at 563. The

court based this finding on two grounds. First, the court determined the ALJ wholly discounted

the claimant's unrebutted testimony that he was taking unscheduled breaks (sometimes for

twenty minutes) three to five times during his five-hour shift. *Id.* Second, the ALJ not only failed

to explain why he gave more weight to the opinions of the state-agency psychologists than he did

to the long-time counselor, but the state-agency psychologists failed to support their findings

with medical evidence. *Id.* at 564.

But here, the ALJ did not impose significantly more weight to opinions from the state-

agency consultants, and where the ALJ did note certain findings were persuasive, those findings

were supported by the record. [*See* DE 13 at 825–26]. Moreover, the ALJ did not present an

inexplicable or spontaneous hypothetical condition to the vocational expert when soliciting

20

testimony as to other jobs in the national market that Plaintiff could perform. Finally, where the *Lanigan* claimant's psychological notes supported greater limitations and were ignored outright by the ALJ, here the ALJ considered Plaintiff's psychological records in depth and found that no such limitations were warranted.

Therefore, the Court finds that the ALJ's finding of no additional limitations for off-task time and absences contains a logical bridge and is supported by substantial evidence in the record.

## II.       The ALJ Did Not Err in Rejecting Plaintiff's Subjective Statements.

The second issue is whether the ALJ properly accounted for Plaintiff's subjective statements regarding her symptoms. [DE 14 at 15]. Generally, an ALJ's credibility determination or subjective symptom analysis is "entitled to special deference because the ALJ has the opportunity to observe the claimant testifying." *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010) (citing *Castile v. Astrue*, 617 F.3d 923, 928–29 (7th Cir. 2010)). An ALJ's evaluation of a claimant's subjective symptoms will only be reversed "if it is 'patently wrong,' which means that the decision lacks any explanation or support." *Hess v. O'Malle*y, 92 F.4th 671, 679 (7th Cir. 2024) (quoting *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)); *see also Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir. 2015) (internal citation and quotation marks omitted) ("[A]lthough we defer to an ALJ's credibility finding that is not patently wrong, an ALJ still must competently explain an adverse-credibility finding with specific reasons supported by the record[.]").

Plaintiff argues the ALJ took a "myopic focus on normal objective medical evidence" to suggest her symptoms were uncorroborated by the record, and further, asserts the ALJ highlighted only evidence supporting the decision and not abnormal findings supporting

Plaintiff's statements. [DE 14 at 16]. *See Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015) (quoting SSR 96–7p(4), 1996 WL 374186, at *1) ("[A]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.").[4] Plaintiff also argues that the ALJ improperly rejected or failed to consider other evidence corroborating Plaintiff's symptoms, and that the ALJ failed to consider that pain cannot be measured with objective testing. [DE 14 at 16 (citing *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004))]. Finally, Plaintiff contends the ALJ failed to identify an activity Plaintiff can perform "independently, effectively, appropriately, or on a *sustained* basis"—*i.e.*, daily activities consistent with the RFC findings. [*Id.* at 17 (emphasis in original)]. *See Green v. Saul*, 781 F. App'x 522, 526 (7th Cir. 2019 ) (citing 20 C.F.R. § 404.1529(c)(3)(i); *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016)) ("ALJs are tasked with reviewing the evidence provided and assessing whether a claimant is exaggerating the effects of her impairments, and reviewing daily-living activities is an important part of that evaluation.").

There are two problems with Plaintiff's arguments though. First, although it is true that the ALJ cannot deny benefits *solely* because Plaintiff's subjective statements are uncorroborated by the record, the ALJ's review of objective medical evidence is still an essential component of the overall disability equation and *must* be considered. This is made abundantly clear through the federal regulations, social security interpretations, and our case law. *See* 20 C.F.R. § 404.1529(c) ("Objective medical evidence . . . is a useful indicator to assist us in making reasonable

---

[4] This interpretation has since been rescinded by SSR 16-3p, which went into effect March 28, 2016, and was twice revised and republished. *See* SSR 16-3p, 2017 WL 5180304. The language quoted in *Hall* and in Plaintiff's brief is no longer in the current version and has been revised as follows: "[W]e will not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantive the degree of impairment-related symptoms alleged by the individual." *Id.* at *5. Because this is the version that would have been operative during the relevant period, the Court will rely on this version accordingly.

22

conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work."); SSR 16-3p, 2016 WL 1119029, at *4 ("We must consider whether an individual's statements about the intensity, persistence, and limiting effects of his or her symptoms are consistent with the medical signs and laboratory findings of record."); *Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022) (citing 42 U.S.C. § 423(d)(5)(A) ("Subjective statements by claimants as to pain or other symptoms are not alone conclusive evidence of disability and must be supported by other objective evidence."). Moreover, "[a]lthough a claimant can establish the severity of his symptoms by his own testimony, his subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2004) (citing *Carradine*, 360 F.3d at 764 (Coffey, J., dissenting)).

Second, Plaintiff largely does not identify any particular statements the ALJ failed to consider or that were rebuffed, including those regarding her daily activities. The only statements Plaintiff targets are those centered around her attempts at exercise, including where the ALJ found Plaintiff often had to seek further treatment after her symptoms were exacerbated, as well as where Plaintiff explained her participation in a musical production was a result of modifications made to allow for limited movement and necessary absences. [DE 14 at 17]. Plaintiff argues the ALJ did not explain how these activities demonstrate an ability to sustain work-related functions on a regular and continuing basis. [*Id.*]. But this is not true. The ALJ's discussion of Plaintiff's exercise concerned her complaints about positional changes causing her dizziness and fatigue. In addressing this issue, the ALJ explained that Plaintiff extensively engaged in weight training in 2017 and 2018, and importantly, noted an *almost daily* exercise regimen in January 2018 with Plaintiff performing Zumba and cardio exercises up to six times

23

per week. [DE 13 at 824]. The ALJ further examined Plaintiff's exercise regimen in 2018, where Plaintiff complained of pain in May and December 2018 due to external causes unrelated to exercise, as well as 2020 and 2021, noting no regular exercise due to Covid-19 but her engagement in a dance routine in 2021. [*Id.*].

Yet even outside the context of exercise, the ALJ discussed other facets of Plaintiff's daily routine and symptoms as they related to her functional limitations. [*See id.* at 816, 818, 824, 825]. As a prime example, in addressing Plaintiff's functional capacity in adaptability and self-management, the ALJ discussed reported difficulties from Plaintiff and her husband in performing daily routines, such as her sometimes needing help getting dressed and getting dizzy in the shower, but found these limitations concerned Plaintiff's physical rather than mental impairments. [*Id.*]. Her physical impairments were accounted for when calculating Plaintiff's RFC and determining what appropriate limitations to impose. [*Id.*].

Finally, even when looking at statements Plaintiff made in her medical history, the ALJ's explanation properly accounted for those supported by the evidence and dismissed those that were unsupported. Following the chronological discussion of Plaintiff's statements, the ALJ noted for her 2017 hip pain complaints that everything generally reported back as normal, but that Plaintiff possessed some hip impingement, a positive Faber's testing, and a positive Log Roll testing. [*Id.* at 821]. The ALJ accounted for this in Plaintiff's RFC with postural and hazard limits, alongside the sit and stand option. [*Id.*]. Likewise, for a 2017 complaint of increased orthostatic symptoms over the months prior to her consultation, Plaintiff reported to the doctor that she was unable to exercise due to joint pain and orthostatic issues. [*Id.*]. The ALJ explained the absence of a doctor note indicating that Plaintiff was getting dizzy or having syncopal episodes while changing position, Plaintiff's conflicting testimony that she was able to exercise

24

and perform physical activity at some points, and the return of Plaintiff's physical examination which reported everything as otherwise being normal. [*Id.*]. That said, Plaintiff's complaints about being affected by hot and humid air in the shower were accounted for in Plaintiff's RFC calculation with temperature limits. [*Id.*].

In October 2017, Plaintiff complained of intermittent vertigo, with her examination revealing some tenderness but no other issues with Plaintiff's strength, sensation, and gait. [*Id.* at 822]. Nonetheless, Plaintiff's concerns of vertigo were accounted for in the RFC with postural, hazard, and environmental limits. [*Id.*]. In 2020, Plaintiff complained of neck pain and upper extremity numbness, which was accounted for in the RFC with handling limits. [*Id.*]. In July 2021, Plaintiff complained of neck pain, upper extremity numbness, left foot pain, and bilateral hip pain, with her examination revealing some decreased sensation to light touch but no other significant findings. [*Id.*]. These issues were also accounted for in the RFC with handling limits. [*Id.*]. Further, while there was no record support for claims of reduced mobility, with Plaintiff's EMG revealing no evidence of upper extremity abnormalities, the ALJ did account for some indicative signs of carpal tunnel syndrome with additional handling limits. [*Id.* at 824].

In October 2021, Plaintiff complained of wheezing and chest tightness when trying to exercise, but her physical examination revealed no significant wheezing or other notable findings. [*Id.* at 822–23]. The ALJ still accounted for this in the RFC with environmental limits. [*Id.*]. In November 2023, Plaintiff complained of foot pain with hypermobility on both feet and ankle pain. [*Id.* at 823]. Plaintiff's physical examination revealed everything was normal, yet the doctor's advice to wear shoes and orthotics around the house were accounted for in the RFC with postural and hazard limits. [*Id.*].

As for Plaintiff's comments regarding her fatigue, which was historically noted in the record, the ALJ accounted for this in the RFC but also found additional limitations were unwarranted given Plaintiff's reported improvement with CPAP and her admitted habit of not going to bed at regular hours. [*Id.*]. Finally, as to Plaintiff's GI issues, the ALJ highlighted Plaintiff's testimony during the 2024 administrative hearing but explained that the record did not support her statements. [*Id.*]. In particular, the ALJ noted that she reported improvement while on Benzyl during the relevant period, that her follow-up consultations negated her comments about worsening symptoms, and that her pelvic/abdominal imaging was normal. [*Id.*].

Overall, there is no indication that the ALJ failed to consider Plaintiff's statements or that the ALJ's findings were not supported by the record. Because the ALJ's findings are not patently wrong, the Court must affirm. *See Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013).

### III.    Plaintiff's Step Five Argument Is Waived.

Finally, Plaintiff argues the ALJ's findings under step five are unsupported because the vocational expert did not explain what facets of other suggested jobs would account for the alternating postural limitations, nor did the ALJ account for the vocational expert's conclusory reliance on experience. [DE 14 at 18]. Essentially, Plaintiff raises a challenge as to the vocational expert's methodology. In response, the Commissioner argues that Plaintiff attempts to bypass the ALJ's findings by ignoring the expertise of the vocational expert outright. [DE 18 at 14]. Further, the Commissioner notes that because the Directory of Occupational Titles does not discuss sit/stand options, the vocational expert's twenty-five years of experience is a reliable substitute for supporting their finding as it relates to other suitable jobs in the national market. [*Id.*].

Yet the Court need not discuss the merits of the parties' arguments because this issue was not properly preserved during the administrative proceedings. As the Seventh Circuit has

explained, "a claimant must object to the VE's testimony or otherwise indicate that the testimony is unreliable during the administrative hearing (or after, in a [post-hearing] brief) to preserve his objection." *Leisgang v. Kijakazi*, 72 F.4th 216, 219–220 (7th Cir. 2023) (citing *Fetting v. Kijakazi*, 62 F.4th 332, 337 (7th Cir. 2023)). Further, the court explained that any objections "must also be specific enough to 'indicate that [the claimant] believed the methodology was unreliable,'" and that general objections are, without more, insufficient. *Id.* at 220 (alteration in original) (quoting *Fetting*, 62 F.4th at 338).

Here, Plaintiff did not object to the vocational expert's experience, nor did she question or object to the vocational expert's answers as they pertained to the ALJ's posed hypothetical. [DE 13 at 873–734]. In fact, the only question Plaintiff's counsel asked the vocational expert concerned unscheduled breaks, which is not the basis for the argument Plaintiff now raises. [*See id.* at 875]. Moreover, Plaintiff did not file a post-hearing brief following the ALJ's decision, and although she raised written exceptions to the Appeals Council, [*see id.* 805–06], no specific reasons were given to support the exceptions, [*see id.* at 802]. Accordingly, this issue is waived. *Leisgang*, 72 F.4th at 220 ("[A] claimant may not start objecting to unquestioned and uncontradicted VE testimony in federal court after the closure of the administrative record.").

## CONCLUSION

For these reasons, the Court **AFFIRMS** the ALJ's decision. Because this ends the merits review of this matter, the Clerk of Court is **DIRECTED** to close this case.

SO ORDERED.

ENTERED: June 24, 2026

/s/ GRETCHEN S. LUND
Judge
United States District Court

27